**MORRISON TENENBAUM, PLLC**
Lawrence F. Morrison
87 Walker Street, Floor 2
New York, NY 10013
Tel:  (212) 620-0938
Fax: (646) 390-5095
lmorrison@m-t-law.com

*Counsel for Margaret Wu*


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                 :
    In re:                                                       :    Chapter 11
                                                                 :
    Queen Elizabeth Realty Corp.,                                :    Case No. 13-12335 (SMB)
                                                                 :
                                Debtor.                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW IN SUPPORT OF MOTION FOR AN ORDER
DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE,
OR IN THE ALTERNATIVE, CONVERTING THIS CASE TO CHAPTER 7**


Margaret Wu, a party in interest of the debtor, Queen Elizabeth Realty Corp. (the

"Debtor"), respectfully submits the following Proposed Findings of Fact and Conclusions of Law

in support of her motion (the "Motion") for an order appointing a Chapter 11 trustee in the

above-captioned case, or in the alternative, converting it to one under Chapter 7. This Motion is

made pursuant to 11 U.S.C. §§1104(a)(1)-(3), and 1112(b)(4).

**PROPOSED FINDINGS OF FACT**

I.    **Queen Elizabeth Realty Corp., New Enterprise**
      **Realty, LLC, and Hong Kong Supermarket**

1.    On July 17, 2013 (the "Filing Date"), the Debtor commenced this Chapter 11 case

in this Court by filing a voluntary Chapter 11 petition (the "Petition").  The Debtor is a single

asset real estate business and owns a commercial condominium unit located at 157 Hester Street,

also known as 68-82 Elizabeth Street, New York, New York (the "Real Property").

2.    Jeffrey Wu (a/k/a Myint J. Kyaw) signed the Petition as the Debtor's purported

President, and purports to own and control the Debtor.[1]  Jeffrey Wu has also served as the

managing member of New Enterprise Realty, LLC ("New Enterprise").

3.    Pursuant to a master lease, New Enterprise has been a tenant of the Debtor at the

Real Property.  *See* Fong Decl. [Docket No. 28], ¶¶6 and 9, and Exh. 3.

4.    New Enterprise subleased the Real Property to, among others, Hong Kong

Supermarket Inc. and/or Hong Kong Supermarket of Hester Street Corp. d/b/a Hong Kong

Supermarket (collectively, "Hong Kong Supermarket") and Salon de Tops, Inc. (the "Salon").

*See* Fong Decl., ¶8.  Jeffrey Wu is also the principal owner of Hong Kong Supermarket.  *See*

Fong Decl., ¶¶8 and 10; and Exh. 4.

---

1    Three (3) brothers—Jeffrey, Lewis and Phillip Wu—contend that they own equal percentage
     shares in the Debtor.  However, there is substantial evidence to the contrary.  For example, as set
     forth in the May 24 Order (defined below), a hearing in the Matrimonial Action (defined below)
     was conducted before a special referee on the issue of the extent of Phillip Wu's ownership
     interests in certain properties, including QERC, and the need for appointment of a receiver to
     protect his wife Margaret Wu's equitable distribution interests therein.  (*See* Declaration of Dean
     K. Fong in Support of Motion to Dismiss *et al.* ("Fong Decl."), dated September 18, 2013
     [Docket No. 28], Exh. 1-2.  In the May 24 Order, the State Court found that "defendant [Phillip
     Wu] is the nominal and/or beneficial owner[] of several businesses, including … Queen Elizabeth
     Realty…."  (*Id.*)  In any event, the conflict arises from the fact that Jeffrey Wu purports to be the
     President of, and otherwise to control, the Debtor.

5.      The Debtor, as landlord, entered into a master lease with New Enterprise, as tenant, which in turn entered into a sub-lease with Hong Kong Supermarket – at substantially below market rent[2] – for a majority of the space in the Real Property.  Jeffrey Wu has, at relevant times, owned and/or controlled the Debtor's tenant and sub-tenant.  (*See* Fong Decl., ¶¶ 6 and 8-10, and Exh. 3-4.)

6.      As of June 2008, the Debtor and New Enterprise entered into an Amended and Restated Mortgage Note, pursuant to which they (collectively, as "Borrower") promised to repay a $4 million loan to Shanghai Commercial Bank Ltd. ("SCB"); the loan was secured by a mortgage on the Debtor's property.  *See* Fong Decl., Exh. 3 (Amended and Restated Note).[3] Jeffrey Wu signed the note on behalf of New Enterprise (as Myint J. Kyaw),[4] and Phillip Wu, Jeffrey Wu's brother, signed on behalf of the Debtor – both as Borrower.  *See* Fong Decl., Exh. 3 (Amended and Restated Note).

7.      Jeffrey Wu, personally, and his company, New Enterprise, obtained additional loans, in the aggregate amount of $10 million.  *See* Cash Collateral Order [Docket No. 30], at pp. 2-4.  In mortgage documents executed in June 2008, December 2009, and July 2010, the Debtor mortgaged the Real Property to secure additional loans in the amount of approximately $10 million.[5]  Although the Debtor was the Mortgagor, the borrowers were collectively only Jeffrey

---

[2]      In fact, the Receiver can establish that the Hong Kong Supermarket lease was grossly under-market and that the fair market value was ***multiple times*** what the Debtor "negotiated" with Hong Kong Supermarket, as its insider-tenant.

[3]      *See also* Stipulation and Order Authorizing Debtor's Interim Use of Cash Collateral ["Cash Collateral Order," Docket No. 30], at pp. 2-4.

[4]      Jeffrey Wu signed the mortgage documents as Myint J. Kyaw.  For simplicity, these Proposed Findings refer interchangeably to the signatures of Jeffrey Wu and Myint J. Kyaw.

[5]      *See* Declaration of Thomas J. Schell in Response to Margaret Wu's Motion ("Schell Decl."), dated January 15, 2014 [Docket No. 65], Exh. 1-3.

Wu and New Enterprise, and the mortgage secured indebtedness guarantying the obligations of
Jeffrey Wu and New Enterprise.

8.      In the June 2008 mortgage securing the $8 million loan to Jeffrey Wu and New
Enterprise, Jeffrey Wu signed the mortgage on behalf of New Enterprise and himself
individually, as Borrower; Phillip Wu, Jeffrey Wu's brother, signed on behalf of the Debtor.  *See*
Schell Decl., [Docket No. 65], Exh. 1.  In the December 2009 mortgage securing the $2 million
loan to Jeffrey Wu and New Enterprise, Jeffrey Wu signed on behalf of the Debtor.  *See id.*, Exh.
2.  And in the July 2010 Extension and Modification of Mortgage and Security Agreement,
which modified the December 2009 mortgage and security agreement, Jeffrey Wu signed on
behalf of both the Debtor, as Mortgagor, and New Enterprise and himself individually, as
Borrower.  *See id.*, Exh. 1-3.  *See also* Fong Decl., Exh. 3.

9.      These facts suggest that the Debtor may have received only some portion of the
$4 million that SCB loaned to the Debtor and New Enterprise.  Indeed, prior to the Petition Date,
the evidence reflects that SCB invoiced the Debtor and New Enterprise for $21,256.53 per month
and the Debtor made monthly payments in that entire amount – even though New Enterprise was
a co-obligor.[6]

10.     More importantly, these facts suggest that the Debtor probably did not receive any
of the proceeds of the other $10 million in loans from SCB, since both New Enterprise and
Jeffrey Wu, *not* QERC, were listed as the borrowers with respect to those additional loans, and

---

[6]      *See* Declaration of Lawrence Morrison, submitted herewith ("Morrison Decl."), Exh. 1 (invoices
from SCB and New Enterprise, and checks from the Debtor to SCB).

neither Hong Kong Supermarket nor Jeffrey Wu was listed as a creditor on the Debtor's

schedules and neither filed a proof of claim.[7]

## II.    **Matrimonial Action between Phillip Wu and Margaret Wu**

11.    In 2009, Margaret Wu commenced a matrimonial action against Phillip Wu in the

Supreme Court of the State of New York, New York County (the "Matrimonial Action") with

Index No. 300080/09.

12.    By an Order dated May 24, 2010, which amended an Order dated May 11, 2010

(collectively, the "May 24, 2010 Order"), the State Court found that Phillip Wu "is the nominal

and/or beneficial owner[] of several businesses, including … Queen Elizabeth Realty….", and

appointed Dean K. Fong, Esq. as the sole receiver of "all of the assets and property" of Phillip

Wu as listed in the order.  *See* Fong Decl., Exh. 1-2.

13.    The May 24, 2010 Order, among other things, granted Mr. Fong, as receiver,

exclusive possession and control of the Debtor, and authorized Mr. Fong, as receiver, to (among

other things) collect "all rents, income and revenues, and payment of mortgages, salaries, taxes

and other obligations and liabilities attributable to" the Debtor, among other properties.  *Id.*  The

Receiver thus was appointed as receiver for QERC, and was authorized to collect rents and other

income attributable to it.

14.    Mr. Fong, as receiver, has been executing the May 24, 2010 Order over three (3)

years by collecting rents and evicting tenants at the Real Property, in accordance with the May

24, 2010 Order.  *See* Fong Decl., Exh. 1.  During the past three (3) years, however, no party has

ever appealed the May 24, 2010 Order.

---

[7]    Because the July 2010 transactions were entered into after the May 24, 2014 Order was issued, without the approval of (or even consultation with) Mr. Fong, as receiver, there is a question whether those transactions were authorized, and hence, whether SCB has a valid security interest with respect to the loans involved in those transactions.

### III.    State Actions Involving the Debtor and the Entities Controlled by Jeffrey Wu

15.    In or about August 2010, Mr. Fong, as receiver, requested that Hong Kong Supermarket and Salon turn over rent payments for the Real Property to the receiver, pursuant to the May 24, 2010 Order.  Thereafter, Salon made payments to Mr. Fong.  However, Hong Kong Supermarket, controlled by Jeffrey Wu, refused to surrender the rent payments.[8]  *See* Fong Decl., ¶¶ 12-13.

16.    Instead, in or about September 2010, New Enterprise, also controlled by Jeffrey Wu, commenced a summary eviction proceeding (the "New Enterprise Action") against the Salon for non-payment of rent, pursuant to the master lease, in the Civil Court of the City of New York, County of New York.  On or about February 14, 2011, Mr. Fong was added to the New Enterprise Action as an interpleader-respondent under index numbers 080075-NLT-2010 and 081070-LT- 2010.  *See* Fong Decl., ¶¶ 14-16.

17.    On or about July 14, 2011, the New Enterprise Action was settled on the following terms (among others):  (1) New Enterprise agreed to pay Mr. Fong the ongoing and previous rents owed to Margaret Wu, subject to certain credits; and (2) New Enterprise consented to entry of a final judgment of possession and the immediate issuance of a warrant of eviction upon failure to make the requisite payments. *See* Fong Decl., ¶¶ 20-21; and Exh. 7.

18.    New Enterprise failed to make the requisite payments to Mr. Fong, which resulted in the entry of a final judgment and issuance of an eviction notice.  On March 1, 2012, a marshal evicted New Enterprise and took legal possession of the Real Property.  *See* Fong Decl., ¶¶ 27-28; and Exh. 10.

---

[8]    Hong Kong Supermarket made a small number of payments in 2012, as a condition of stipulations adjourning the HKS Holdover Action (as described below).

19.    Hong Kong Supermarket continued to occupy the Real Property.  Despite Mr.

Fong's efforts to negotiate a new lease –at a market rate – Jeffrey and Lewis Wu, as purported

officers of the Debtor, filed a motion on May 2, 2012 to intervene and recover monies collected

by Mr. Fong, among others.  Although Hong Kong Supermarket agreed to make interim

payments for use and occupancy in the amount of $40,000 per month subject to certain credits,

while the motion was pending, Mr. Fong never received any payments.  *See* Fong Decl., ¶¶ 30-

32; and Exh. 11.

20.    On or about July 24, 2012, Mr. Fong commenced a landlord-tenant holdover

action against Hong Kong Supermarket (the "HKS Holdover Action").  The hearing date for this

action was subsequently adjourned several times, pending negotiations.  *See* Fong Decl., ¶¶ 33-

35.

21.    Ultimately, the hearing for the HKS Holdover Action was scheduled, rather than

adjourned.  On June 4, 2013, Jeffrey Wu attempted to stay the HKS Holdover Action in the

Matrimonial Action, on behalf of Hong Kong Supermarket and the Debtor, but the court denied

that request.  *See* Fong Decl., ¶¶ 38.

22.    On June 13, 2013, in the HKS Holdover Action, Mr. Fong obtained a judgment in

the sum of $3,256,000 against Hong Kong Supermarket.  *See* Fong Decl., ¶¶ 39; and Exh. 15.

The judgment was issued based on the testimony of Mr. Fong, as receiver, that $100 per square

foot was the fair and reasonable rent for the space occupied by Hong Kong Supermarket, and the

fact that the supermarket occupied approximately 26,000 square feet.

23.    On June 28, 2013, a warrant of eviction was issued.  *See* Fong Decl., ¶¶ 39; and

Exh. 15.

24.    On July 10, 2013, Jeffrey Wu sought to enjoin the eviction of Hong Kong Supermarket in the Matrimonial Action, but was unsuccessful.  On July 11, 2013, Margaret Wu moved in the Matrimonial Action, by order to show cause, for an order, among others, directing an inquest on the equitable distribution of marital property, and directing an immediate sale of the remaining marital property, including the Debtor, and imposing other sanctions (the "Sale Motion").  *See*  Fong Decl., ¶¶ 40-41; and Exh. 17.

IV.    **The Debtor's Efforts to Stall the Enforcement of a Judgment That Inured to the Debtor's Benefit**

25.    Shortly after the judgment against Hong Kong Supermarket was issued and several days after Margaret Wu's Sale Motion was served, the Debtor, by its purported President, Jeffrey Wu, filed this instant bankruptcy proceeding.

26.    As Debtor's counsel stated at the August 29, 2013 hearing in this case, the primary purpose of filing this case was to stay the judgment against Hong Kong Supermarket:

> Queen Elizabeth Realty Corp. filed for Chapter 11 relief on July 17th of this year in order to stay the eviction by a receiver for a one-third shareholder of the debtor of Hong Kong Supermarkets.

*See* Declaration of Suzanne M. Berger in Support of Motion to Dismiss *et al.* [Docket No. 27], Exh. A (August 29, 2013 hearing transcript in this case), at 5:23-6:1.

27.    On the Petition Date, Hong Kong Supermarket, controlled by Jeffrey Wu, appealed the judgment in the HKS Holdover Action.  The same day, the Debtor also removed the HKS Holdover Action to this Court as an adversary proceeding (Adv. Proc. No. 13-AP-01496).  On August 1, 2013, the Debtor also removed the Matrimonial Action to this Court as an adversary proceeding (Adv. Proc. No. 13-AP-01495).[9]

---

[9]    This Court subsequently entered a written opinion holding that both removed proceedings are remanded.  *See* Docket No. 11 in Adv. Proc. No. 13-AP-01495.

28.    On July 29, 2013, the Debtor filed a separate adversary proceeding against Mr.

Fong and Margaret Wu (Adv. Proc. No. 13-AP-01386) to avoid the judgments against New

Enterprise and Hong Kong Supermarket, the May 24, 2010 Order, the warrant of eviction against

Hong Kong Supermarket and other proceedings in the State Court.

29.    As a result of the proceedings in state court, the Debtor now has a judgment

against Hong Kong Supermarket in the sum of $3,256,000, as well as a warrant of eviction –

both of which benefit the Debtor.

30.    The following colloquy between the Court and the Debtor's counsel took place at

the hearing on various motions in this case on October 31, 2013 (the "October 2013 Hearing"):

> THE COURT:  With respect to the supermarket, you're now in control of the
> property. You are free to enter into a lease subject to court order because that
> lease has been terminated by operation of law but you can enter into a new lease
> with Hong Kong Supermarket or anybody else but that's got to be on notice to all
> the parties in the action and it sounds like the receiver may raise the issue that it's
> an inappropriate lease.  It's below market. An alternative is simply to hire a
> broker.  You say you need a broker for the other space. Hire a broker.  Go out and
> market the space. Put somebody in there who's paying rent. I'm not saying you
> can't enter into a lease with Hong Kong [Supermarket]. It's an appropriate lease
> and it's market but you're going to have to show that you marketed the property.
> Correct?
>
> MR. GLUCKSMAN:  [Inaudible] counsel to Jeffrey and Lewis Wu and the Hong
> Kong [Supermarket] to speak to that.
>
> THE COURT:  I don't have to hear it today. If you want to enter into a lease with
> Hong Kong Supermarket you know well under the bankruptcy law you're going
> to have to show that it's an appropriate exercise of business judgment and part of
> that judgment is what you did to -- what if anything you did to market the lease or
> why you think it's an appropriate lease and they're going to say you didn't market
> it and here's what the square foot rental is in that area or something like and then
> you're going to have that issue.

*See* Schell Decl. [Docket No. 65], Exh. 4 (October 31, 2013 transcript).

31.    Despite the Court's admonition, at the October 2013 hearing, that the Debtor

either hire a broker to lease the space currently occupied by Hong Kong Supermarket, or

otherwise ensure that the lease was at fair market value, Ms. Wu has not been made aware of any efforts by the Debtor either to collect on the $3.26 million judgment against Hong Kong Supermarket, to retain a broker for the space it occupies, or otherwise to market that property.

32.    At the October 2013 hearing, Debtor's counsel stated that Hong Kong Supermarket is not paying rent to the Debtor.  (*See* Schell Decl., Exh. 4, at 31:11-17).  Debtor's counsel also stated that Hong Kong Supermarket "has been funding the cash flow that pays the bank's debt service under the cash collateral order."  (*Id.*)  However, the Debtor has not provided information concerning what portion of that payment is attributable to the Debtor's obligations and what portion is attributable to the obligations of New Enterprise, an entity owned and controlled by Jeffrey Wu.  As explained above, Jeffrey Wu and New Enterprise – not the Debtor – owed most of the $14 million in loans to SCB, even though the entire amount of those loans was secured by the Debtor.

33.    The foregoing facts reflect that the Debtor is not receiving market rent from Hong Kong Supermarket and that the Debtor is not making reasonable efforts to obtain market rent for the approximately 26,000 square feet of prime commercial space that Hong Kong Supermarket continues to occupy in the Debtor's Real Property.

**V.    The Debtor's Failure To Timely File Monthly Operating Reports,
and the Unexplained Transactions between the Debtor and Related Parties**

34.    The Debtor has repeatedly abdicated its responsibilities to properly administer the estate.  Notwithstanding the requirement that all monthly operating "reports must be filed by the 20th day of the month following the reporting period,"[10] the Debtor has not filed any of its

---

[10]    *See* "Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees," U.S. Department of Justice, Office of the U.S. Trustee (rev'd 2/18/2011), http://www.justice.gov/ust/r02/docs/chapter11/r2_operating_guidelines.pdf ("Trustee Operating Guidelines").

monthly operating reports on time – and usually filed them several months after they were due. The docket reveals the following:

a.    The operating reports for the periods July 17-31, August, September, and October 2013 were all filed on December 9, 2013.

b.    The operating report for November 2013 was filed on January 28, 2014.

c.    The operating report for December 2013 was filed on April 3, 2014.

d.    The operating reports for January, February, March, April, May, June, and July 2014 were all filed on August 21, 2014.

The operating report for September 2014 has not been filed, although it was due on October 20, 2014.

35.    In addition, the untimely operating reports reflect related party transactions that may not be authorized. For example, the Debtor's monthly operating reports for August and October 2013 [Docket Nos. 57 and 60] reflect a monthly mortgage payable of $21,257 in each Schedule of Cash Receipts and Disbursements ("Cash Schedule").[11] However, the Cash Schedules for the months of August, September, October, and November 2013[12] reflect varying amounts for the monthly mortgage payments, as well as unexplained amounts the Debtor paid that were purportedly "due to affiliates," as follows:

| Month | Mortgage Payable | Due to Affiliates |
|-------|------------------|-------------------|
| August 2013 | $21,257 | $42,513 |
| September 2013 | $63,770 | $64,000 |
| October 2013 | $21,257 | $42,513 |
| November 2013 | $42,513 | $97,302 |

---

[11]    Similarly, as explained above, invoices issued by SCB to the Debtor and New Enterprise and checks paid by the Debtor to SCB were in the amount of approximately $21,257 per month.

[12]    The monthly operating report for July 2013 does not reflect the monthly mortgage payable category.

36.     The reports (i) fail to explain the discrepancy between the amounts of the pre-petition payments and the amounts paid post-petition, and (ii) fail to provide the identities of the "affiliates" referred to in the monthly operating reports, the amounts that are being paid to or for the benefit of each affiliate, or the basis and authority for such payments.

37.     On March 18, 2014, Mr. Fong, as receiver, by his counsel transmitted a letter to Debtor's counsel requesting that the Debtor supply the explanations and information described above, which the operating reports failed to include.  *See* Morrison Decl., Exh. 2.  The Debtor never provided a response.

## PROPOSED CONCLUSIONS OF LAW

### I.   Standards to Appoint a Chapter 11 Trustee

1.     Section 1104(a) of the Bankruptcy Code states, in pertinent parts, that:

> At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest…and after notice and a hearing, a court shall order the appointment of a trustee—
>
> a.  for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case…;
>
> b.  if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate…; or
>
> c.  if grounds exist to convert … the case under section 1112, but the court determines that the appointment of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. §1104(a).

2.     Sections 1104(a)(1) and (2) of the Bankruptcy Code provide that in order to appoint a Chapter 11 trustee, either cause must exist or such appointment is in the best interest of creditors. Section 1104(3) reflects the Congressional intent to maintain viable Chapter 11 cases in the bankruptcy system, rather than surrender to liquidation.  HR Rep. No. 31, 109th Cong. 1st Sess 442 (2005).  Once the burden is met, appointment of a trustee becomes mandatory as Section 1104(a) states that a court "*shall* order the appointment of a trustee." (emphasis added).

3.     Chapter 11 of the Bankruptcy Code is designed to allow a debtor-in-possession to retain management and control of the debtor's business operation. *See In re Eurospark Indus.*, 424 B.R. 621, 627 (Bankr. E.D.N.Y. 2010). It is well recognized, however, that a debtor-in-possession owes fiduciary duties to the bankruptcy estate and must, among other things, "protect and…conserve property in [its] possession for the benefit of creditors" and "refrain[] from acting in a manner which could damage the estate, or hinder a successful reorganization of the

business." *In re Ionosphere Club, Inc.*, 113 B.R. 164, 169 (Bankr. S.D.N.Y. 1990). "[T]he

willingness of courts to leave debtors-in-possession is premised upon an assurance that the

officers and managing employees can be depended  upon to carry out the fiduciary

responsibilities of a trustee." *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343,

355 (1985); *In re v.. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989).

4.      The list of wrongs constituting "cause" is non-exclusive, and includes: "***conflicts***

***of interest***, including inappropriate relations between corporate parents and the subsidiaries;

misuse of assets and funds; inadequate record keeping and reporting; various instances of

conduct found to establish fraud or dishonesty; and lack of credibility and creditor confidence."

*In re Altman*, 230 B.R. 6, 16 (Bankr. D.Conn. 1999) (emphasis provided).  In a recent case in

which a motion for the appointment of a bankruptcy trustee was granted, the Bankruptcy Court

for the Southern District of New York explicitly noted that "I need a trustee to ensure that the

Debtors are hereafter managed free of plainly existing conflicts of interest." *In re Soundview*

*Elite, Inc.*, 503 B.R. 571, 582 (Bankr. S.D.N.Y. 2014).

5.      In the Second Circuit, a clear and convincing evidence standard was adopted in

assessing whether to appoint a Chapter 11 trustee under Section 1104(a)(1). *In re Bayou Group,*

*LLC*, 564 F.3d 541, 546 (2d Cir. 2009); *In re Euro-American Lodging Corp.*, 365 B.R. 421, 426

(Bankr. S.D.N.Y. 2007).  Once a court finds cause under Section 1104, "there is no discretion; an

independent trustee must be appointed." *1031 Tax Group, LLC*, 374 B.R. 78 (Bankr. S.D.N.Y.

2007).

6.      Section 1104(a)(2) covers appointing a trustee even when no "cause" exists, so

long as it is in the interests of the creditors, any equity security holders and other interests of the

estate. *See Sharon Steel*, 871 F.2d 1217, 1226 (3d Cir. 1989); *In re Ridgemour Meyer Props.,*

*LLC*, 413, B.R. 101, 113 (Bankr. S.D.N.Y. 2008). Under Section 1104(a)(2), courts look to the practical realties and necessities of the case, and the standard is flexible. *Id.*, 413 B.R. at 112; *In re Adelphia Comm's Corp.*, 336 B.R. 610, 658 (Bankr. S.D.N.Y. 2006), aff'd 342 B.R. 122 (S.D.N.Y. 2006); *Euro-American, supra*, 365 B.R. at 427; *1031 Tax Group, supra,* 374 B.R. at 90-91.  The courts consider the following factors, among others: (1) the trustworthiness of the debtor; (2) the debtor's past and present performance and prospects for rehabilitation; (3) the confidence – or lack thereof – of the business community and of creditors in present management; and (4) the benefits derived from the appointment of a trustee, balanced against the cost of the appointment. *Ridgemour, supra*, 413 B.R. at 112; *Euro-American, supra*, 365 B.R. at 427; *1031 Tax Group, supra*, 374 B.R. at 91.

7.      As explained below, cause for the appointment of a trustee is present, and, in any event, such appointment is in the best interest of creditors and parties in interest.

## II.      Cause Exists for the Appointment of a Chapter 11 Trustee

8.      Appointing a Chapter 11 Trustee is required for cause under 11 U.S.C. §1104(a)(1), due to the non-waivable, inherent conflict of interests caused by Jeffrey Wu's multiple fiduciary duties.  Jeffrey Wu, as the Debtor's fiduciary, cannot operate the Debtor in the chapter 11 context, as Jeffrey Wu also has equivalent fiduciary duties to New Enterprise and Hong Kong Supermarket. The Debtor has a duty to pursue the non-payment of rents by New Enterprise and Hong Kong Supermarket. However, so long as the three (3) entities have the same individual as managing member, principal or president, the Debtor's bankruptcy estate cannot be properly protected. These fiduciary duties are in a direct conflict, and cannot be waived, nor can they co-exist.  Therefore, the Debtor will inevitably compromise the best interests of its bankruptcy estate and its creditors, and will not zealously pursue its interests against New Enterprise and Hong Kong Supermarket.

15

9.      The following specific facts establish cause for the appointment of a trustee.

10.      *First*, there is substantial evidence of conflicts of interest, particularly of inappropriate relations between corporate entities owned and/or controlled by the same individuals.  Jeffrey Wu, the purported President and a purported one-third owner of the Debtor, has also been, at relevant times, the Managing Member of New Enterprise and the principal owner of Hong Kong Supermarket.  Jeffrey Wu signed various loan documents – seemingly interchangeably – on behalf of the Debtor and New Enterprise (and in one case on behalf of *both*), pursuant to which he caused the Debtor to pledge its property to secure (i) approximately $10 million in loan obligations that appear to have benefited only New Enterprise and himself personally, and (ii) approximately $4 million in loan obligations that appear to have benefited New Enterprise, as well as the Debtor.  The only conclusion that can be reached from these facts is that current management has saddled the Debtor with substantial debt while providing little or no value in exchange.

11.      It appears that current management's lack of concern with maximizing the Debtor's assets and minimizing its liabilities has continued into and through the bankruptcy case.  The Debtor has admitted that Hong Kong Supermarket is not paying rent, but is funding debt service to SCB.  However, the substantial majority of that debt service appears to be attributable to New Enterprise and Jeffrey Wu personally.  Indeed, the monthly operating reports (albeit deficient in detail), together with SCB's invoices to the Debtor and New Enterprise (*see* Morrison Decl., Exh. 1), suggest that, although the Debtor may only owe approximately $10,628 (*i.e.*, one half of the monthly invoice of $21,257 issued by SCB to the Debtor and New Enterprise) in monthly payments to SCB, the Debtor is recording substantial sums "Due To Affiliates" – likely, New Enterprise, Jeffrey Wu, and/or Hong Kong Supermarket.

12.     In addition, the Debtor has steadfastly refused to pursue a judgment in the amount

of $3.26 million against its subtenant, Hong Kong Supermarket, or to look for a tenant to pay

market rent for the approximately 26,000 of prime commercial real estate that Hong Kong

Supermarket occupies – despite the Court's admonition that the Debtor make efforts to obtain

market rent.  The only rational motivation for refusing to enforce such a substantial judgment in

favor of the Debtor and for refusing to increase the Debtor's rent revenues is the desire of current

management to benefit related parties at the expense of the Debtor.

13.     Courts have found that similar circumstances warrant appointment of a trustee.

For example, one court appointed a trustee where it "strongly perceive[d]" that the debtor's

president was "much more concerned about" the future of another business in which he had an

interest that was seeking to purchase the debtor's technology "than any possible success of the

[d]ebtor's chapter 11 case." *In the Matter of Embrace Systems Corp.*, 178 B.R. 112, 128 (Bankr.

W.D. Mich. 1995).  *See generally Collier on Bankruptcy*, § 1104.02[3][c][ii], at p. 1104-12

(Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (collecting cases).  That court also found

"the possible existence of a cause of action" between the debtor and the business in which the

debtor's president had an interest a "very important" consideration in deciding to appoint a

trustee. *Embrace Systems*, 178 B.R. at 128-29.  Here, the facts establish that current

management is more concerned with supporting New Enterprise and Hong Kong Supermarket,

and stalling enforcement of a $3.26 million judgment against Hong Kong Supermarket, than with

ensuring the Debtor's viability in this Chapter 11 case.

14.     Moreover, courts have held that a person who insisted that he was a creditor of the

debtor "cannot fulfill the responsibilities of managing the debtor in possession," *In re New

Towne Dev., LLC*, 404 B.R. 140, 149 (Bankr. M.D. La. 2009), and that management's "leasing

the [debtor's] land for less than market value" was a factor in determining whether to appoint a trustee for the debtor, *Keeley & Grabanski Land P'ship v. Keeley (In re Keeley & Grabanski Land P'ship)*, 455 B.R. 153, 163 (8th Cir. B.A.P. 2011). Here, it appears that certain entities owned and/or controlled by Jeffrey Wu may consider themselves creditors, as apparently reflected in the operating reports, and the Debtor appears to be leasing space to Hong Kong Supermarket at substantially below-market rents.

15.    **Second**, the Debtor has not been properly administering the estate, and there is evidence of inadequate record keeping and/or reporting and of potential misuse of assets and funds. The Debtor's repeated failures to file timely operating reports is, by itself, a basis for appointing a trustee. *See* Trustee Operating Guidelines. Further, the operating reports do not adequately detail the transactions between the Debtor and related parties, including Hong Kong Supermarket; such detail is particularly important where, as here, current management of the Debtor is closely related to other entities with which the Debtor conducts most of its business. Finally, as explained above, the information provided in those reports shows that the Debtor may be paying SCB for obligations owed by related parties, rather than legitimate obligations of the Debtor.

16.    In sum, due to the inherent conflicts of interest among the Debtor, Hong Kong Supermarket, New Enterprise, and Jeffrey Wu (the Debtor's purported President), a Chapter 11 Trustee is needed to reevaluate the Debtor's books and records, and corroborate or correct the current composition of the Debtor's pre-petition debt structure.

## III.    The Appointment of a Chapter 11 Trustee is in the Best Interest of Creditors

17.    The foregoing reasons also establish that, under 11 U.S.C. §1104(a)(2), the Debtor is not operating in the best interest of the creditors and other parties in interest. The officers and owners (or purported owners) of the Debtor, New Enterprise, and Hong Kong

Supermarket have directly conflicting interests, which cannot be represented by the same individuals; current management appears more concerned about the Debtor's related parties than maximizing the Debtor's assets for the benefit of all creditors and other parties in interest.[13]

18.     With respect to the practical realties and necessities of this case, it is also necessary to appoint a disinterested third-party trustee since the Debtor and other parties in interest consist of many of the related family members of the three brothers – Jeffrey, Lewis and Phillip Wu.  By appointing a third-party trustee, the case would be managed more objectively, which would be in the best interest of creditors and other parties in interest in this case.

## IV.     Alternatively, the Court May Convert the Case to One Under Chapter 7

19.     If the Court elects not to appoint a Chapter 11 trustee, conversion of the case to one under Chapter 7 is respectfully requested.  The above-stated reasons for appointment of a trustee similarly support conversion.

20.     This case has been costly for all parties in interest, and the same issues seem to be re-litigated in the Matrimonial Action, in the HKS Holdover Action, and in this instant bankruptcy proceeding along with multiple adversary proceedings.  For the reasons stated above, there has been a gross mismanagement of the estate within the meaning of section 1112(b)(4)(B) of the Bankruptcy Code.  Moreover, no plan of reorganization has been filed, and given the facts set forth above, it is likely that any plan that would be filed under current management likely would unfairly favor the Debtor's related parties to the detriment of the Debtor.

---

[13]     In addition, prior to bankruptcy filing, Jeffrey Wu also retained the same law firm, The Hugh Mo Firm, on behalf of the Debtor, New Enterprise and Hong Kong Supermarket, among other entities. By doing so, Jeffrey Wu and Lewis Wu had acted not in best interest of the Debtor, and the pattern of their diluted fiduciary duty to the creditors and the Debtor continues to exist to this date.

Dated: New York, New York
      October 21, 2014

                                            MORRISON TENENBAUM, PLLC

                                      /s/ Lawrence Morrison
                                      Lawrence F. Morrison
                                      87 Walker Street, Floor 2
                                      New York, NY 10013
                                      (212) 620-0938

To:    Bryan Cave LLP
        1290 Avenue of the Americas
        New York, NY 10104
        212-541-2034

        Herrick Feinstein, LLP
        2 Park Avenue
        New York, NY 10016
        (212) 592-1400

        DelBello Donnellan Weingarten
        Wise & Wiederkehr, LLP
        One North Lexington Avenue
        White Plains, NY 10601
        (914) 681-0200

        Pryor Cashman LLP
        7 Times Square
        New York, NY 10036-7311
        (212) 421-4100

        Office of the U.S. Trustee
        33 Whitehall Street, 21st Fl.
        New York, NY 10004
        (212) 510-0500